UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                          Bankruptcy No. 08-30796
                                                Chapter 7
Audie L. Baca,
f/d/b/a Baca Cattle LLP,
f/d/b/a Foster County Feeders LLP,
Jo Elizabeth J. Baca,
a/k/a Elizabeth J. Baca,

                    Debtors.
_____/

Edward L. Brown and
George A. Brown,

                    Plaintiffs,

            vs.                                 Adversary No. 08-7033

Audie L. Baca,

                    Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed November 18, 2008, Plaintiffs Edward L. Brown and George A. Brown initiated this adversary proceeding seeking a determination that all amounts, if any, due from Debtor/Defendant Audie L. Baca to Plaintiffs as eventually determined by a state court are nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).  By Answer filed December 19, 2008, Defendant denies the allegations.

The matter was tried before the Court on April 20 and 21, 2009, and the parties submitted post-trial briefs on May 15, 2009.  The following constitutes the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Defendant is 49 years old and has held various jobs at cattle feedlots essentially his entire working life. As a pen rider at more than one feedlot, he checked for problems with the cattle in their pens and kept track of cattle counts. As a head processor at another feedlot, he administered shots and vaccines to new cows after they were received. He was an assistant manager at another feedlot where his responsibilities included accounting for the cattle and the feed mill commodities. He was a yard foreman at yet another feedlot.

In February 1997, Defendant and his wife moved to North Dakota to be closer to her parents, and Defendant began working for Butts Feedlot, a custom feeding operation near Carrington, North Dakota. He received, counted, tended and fed customers' cattle. Once the cattle became large enough, Defendant ensured they were sold. While he worked there, he was also involved in purchasing cattle for others. He contacted buyers and decided how much to pay for a given size and sex of cattle on their behalf. The cattle came to the feedlot, and Defendant fed and weighed the cattle until they were at sell weight. Defendant worked at the Butts Feedlot until the owners sold the feedlot to Jim Krueger in April 2001.

A.    Foster County Feeders

Defendant developed Foster County Feeders (FCF) with Krueger, Stuart Richter, and several other partners to lease the feedlot from Krueger.[1] This was the first time Defendant was involved in a feedlot as an owner, and he was also employed by FCF as the general manager. FCF had

---

[1] Defendant testified Krueger was only a partner in FCF for three months because he did not get along with the other partners. Krueger did, however, allow FCF to continue to lease his yard after he parted from FCF.

2

between four and six employees at any given time, and Defendant supervised them.  He also scheduled feed loads, spoke with customers about commodities, talked to representatives of Tyson Fresh Meats, Inc. about selling cattle to them, and helped in the yard as necessary.

According to Defendant, the business relationship between him and Plaintiff George Brown began when Plaintiff George Brown placed some of his home-raised cattle in FCF's lot in the summer or early fall of 2001.

Some customers only had FCF feed their cattle – as Defendant testified FCF did with Plaintiff George Brown's home-raised cattle – but other customers were investment feeders. Defendant testified that investment feeder customers were typically individuals with full-time jobs who had FCF purchase cattle for them and then feed them.  Like at the Butts Feedlot, Defendant advised customers how much to pay for a particular sex and size of cattle based on the futures markets and the costs of feed and other expenses, and then purchased cattle for FCF's customers. Defendant testified that he began purchasing cattle for Plaintiffs in early 2002.

Defendant testified that if he knew a certain customer wanted cattle before a sale, he had the customer's name put on the cattle at the sales barn.  Customers had the option of turning cattle down, and if they did, Defendant would either contact another customer or FCF would purchase the cattle in its own name.  FCF owned a few cattle that were kept in a separate pen, but Defendant did not personally own any cattle in the FCF lot.  If FCF purchased the cattle initially but an interested customer was found, the customer's name was put on the cattle when the lot number was entered into the computer.  Defendant testified that when the sale barn issued sales tickets, most of the time they were in FCF's name.

3

Defendant testified that when cattle arrived at FCF, they were unloaded, weighed, penned on hay, given shots, and assigned lot numbers. After that, the cattle were tagged. Tagging involved placing a soft plastic tag into the ear of each cow for identification. A machine heat-stamped a number onto the tag. There were approximately 25 different colors of tags, and all of the cattle in a given lot were given the same colored tag. After the cattle were tagged, they were designated a pen. Defendant testified that different lots of cattle would not be put in one pen. Instead, the cattle were kept separated by lot to better manage them. The feedlot had between 60 and 70 pens of varying sizes. Each pen in the feedlot had a number, and cattle were kept in the same pen until they were "finished" or ready to be sold. All of the information regarding the cattle count, weight, and lot number was entered into a computer by FCF's bookkeeper, Patty Williams.

Defendant testified there was not a typical lot; rather, customers bought anywhere from 30 to 200 head, and FCF had pens that accommodated 25, 75, 150 or 300 head. Depending on the size of the lot, the cattle went into a certain pen. If a customer wanted to buy 100 cattle, it might have taken between one and five sales to reach the 100 head count. If it took five sales, the cattle from the first sale would be unloaded, weighed, inspected, and placed on hay. Defendant took the weight ticket to Williams, she assigned a lot number, Defendant made tags with the lot number, and the cattle were tagged and vaccinated. The cattle were then put into the designated pen. When the second group came to the feedlot, they were assigned the same lot number and placed in the same pen. The process was repeated until the head count was achieved.

Defendant testified that Justin Martin was the FCF employee who generally handled the upkeep of the feedlot and monitored the pens for sickness or other problems such as broken gates or pipes. Martin also doctored the cattle. Sick cattle were kept separately because of the threat of

contagion.  If an animal died, Martin removed it from the pen and placed it in the incinerator pit. He then removed the ear tag and reported the death to Williams.  Either Martin or Williams told the feed truck driver about the changed count, and the driver adjusted the feed records accordingly. Defendant testified he tried to keep accurate counts of the dead cattle.

FCF had between 2,500 and 8,000 cattle.  Defendant testified he counted the cattle when they came into the yard and when they were removed.  He also counted the cattle if a gate was left open, but not otherwise.  Defendant kept yard sheets for FCF.  Yard sheets are computer spreadsheets with the lot numbers, pen numbers, feed consumption, and the number of dead cattle.  Defendant testified that FCF was careful about record keeping.

FCF and its customers verbally contracted feed price terms.  FCF's pricing included a $0.25 yardage fee per head per day plus the cost of feed.  The feed was mixed in a truck, and each ration had a price.  FCF's feed trucks had scales, and as a truck delivered feed to a pen, the driver kept track of the ration prices and the weight fed and supplied the information to the office where it was entered into a computer.  The feed bills reflected which lots were owned by which customers.

Defendant testified that they kept the cattle between 90 and 200 days before they were sold, depending on the size of the animals when they came to the feedlot.  Cattle of different weights could be mixed into the same lot, and the animals would be sold at different times.

When the time came for the cattle to be sold, Defendant would contact the Tyson[2] buyer to find out the selling price.  Prices changed from day to day, depending on the market.  Defendant would then contact the customer to find out if the customer wanted to sell that week, and if so, how

---

[2] Defendant testified that although other processors exist, he rarely sold to them.

5

many cattle.  If cattle were sold, the Tyson buyer would call for delivery of the cattle to the plant. Cattle sold one week would ship the following week.  Defendant would contact a trucking company to make arrangements.  Defendant would also call a brand inspector 24-48 hours before shipment to arrange for the inspector to be present for the shipment.

On the day of shipping, a customer was not necessarily on the lot although sometimes they were.  Defendant testified, however, that he never shipped cattle without telling a customer. Defendant would bring the pen of cattle out to the sorting area and select the animals that would generate the best return.  Each animal is worth a different amount depending on the amount of fat on them, and Defendant would evaluate them as they walked by and decide which to ship.  The chosen cattle were then weighed.  The trucks were loaded by weight and could ship a maximum of 55,000 pounds.  Defendant testified that ideally each shipment held as many pounds as possible. Next, Defendant would show the brand inspector the pen being sold, and the brand inspector would inspect them.  The brand inspector knew which cattle were being shipped because they were segregated into shipping pens.  The brand inspector counted the cattle being shipped, and the cattle were loaded onto the trucks.   Defendant testified that Martin and another employee often helped with loading cattle.  As the cattle were loaded onto the truck, they were also counted by the truckers, and the cattle were shipped to the Tyson plant in Nebraska.  Defendant was not present when the cattle were moved off the trucks at the plant, but he testified that he assumed the cattle were counted there also.

Plaintiffs' cattle were handled in this manner, and Defendant testified that Plaintiff George Brown often participated in sorting and loading Plaintiffs' cattle.

6

Some customers had the cattle sale proceeds made payable to FCF, in which case FCF would deposit the money into an FCF account. Defendant testified this was only done when FCF carried the feed bill. "Carrying the feed bill" meant that the customer never actually remitted payment for feed; instead the feed bill was subtracted from the sale proceeds and the remainder of the proceeds was sent to the customer. When cattle were sold, Defendant adjusted the feed bill for the customer's lot.

B.      Transitions

Defendant testified that Krueger decided "he wanted his yard back" in the fall of 2003, partly because of disagreements over the years that FCF could not work out with him. Defendant testified that it was primarily the other partners who had the problems with Krueger. In any event, FCF needed to move the 1,500 cattle it fed at the time for Plaintiffs and two other customers from Krueger's lot. Defendant testified he informed FCF's customers that their cattle were being moved, and he counted the cattle as they were loaded from Krueger's lot. Defendant placed FCF's customers cattle at the Bar V Ranch, as further discussed in the next section.

Foster County Feeders was dissolved on April 30, 2004. The dissolution and settlement agreement and release entered into between Richter and Defendant states that upon execution of the agreement, FCF was formally and officially dissolved, its business wound up, and neither party had further legal authority to bind the partnership.[3] Defendant received $250,000 in cash and propertt

---

[3] Although FCF originally had several partners, the same document states, "Between March 22, 2001 and present, various events have occurred and certain partners have come and gone such that Stuart Richter and Audie Baca are the sole remaining partners having equal rights in the management and control of the partnership business and sharing equally (50%-50%) the profits, losses and ownership of capital."

upon the dissolution. It included, according to the dissolution agreement, "the remaining livestock, equipment, machinery, vehicles, and other personal property of Foster County Feeders, LLP, save and except those items set forth in paragraph 1 next above." The items in paragraph 1 are those conveyed to Richter, and included a loader, a feed truck with mixer, a grain vacuum, a hydraulic bench press, and a wire-feed welder.

Defendant invested his proceeds from the dissolution of FCF into Baca Cattle, LLP, which he formed on June 15, 2004, to develop a feedlot in Carrington. Defendant and his wife owned Baca Cattle, and Defendant was also an employee. When Defendant started Baca Cattle, he bought a sale barn, started renovating it, and moved cattle there in July 2004.[4] Defendant testified that his father-in-law, Joe Andrews, loaned him money to buy the sale barn in exchange for a $60,000 mortgage. Defendant owned the building personally, and Baca Cattle operated out of it. Defendant kept all of his records in the building. Harold Klein also funded Baca Cattle. Klein supplied feed and hay to Baca Cattle for six months in exchange for a second mortgage. Defendant testified that each month, he used money from his proceeds to improve the feedlot. He said he was able to use more of his proceeds for these improvements because Klein was supplying the feed and hay. Baca Cattle owned a 2001 Chevrolet truck, and later on, through proceeds of FCF and Baca Cattle, loaders and equipment.

Defendant testified that he and Richter had an oral agreement that Defendant could continue using the FCF name, checkbook, and any other interest after FCF's dissolution until he could get

---

[4] Defendant did not clarify who owned the cattle. Testimony of various witnesses made it clear that some of the cattle at the Baca Cattle feedlot belonged to Plaintiffs, but how many cattle were initailly at the feedlot and how many of them belonged to Plaintiffs was never established.

everything properly wound up.  According to brand inspector records, Defendant continued to use the FCF name for shipments from the Bar V Ranch as late as December 2004.

C.      Bar V Ranch

Meanwhile, as mentioned above, Defendant moved FCF's customers' cattle to the Bar V Ranch in the fall of 2003 and continued to operate as FCF from this new location.  Defendant testified that FCF never had any written contracts, only verbal contracts, and Baca Cattle took over those contracts.  He kept the contracts in FCF's name and continued to bill FCF's customers in FCF's name.

Defendant testified that he took over management of the Bar V Ranch.  The Bar V Ranch billed FCF for the feed and other expenses incurred by FCF's customers, and FCF in turn billed its customers and paid the Bar V Ranch.  Defendant set up shipments of the cattle from the Bar V Ranch.  Defendant testified he kept track of the cattle numbers through the Bar V Ranch employees. According to Defendant, when cattle were shipped from the Bar V Ranch, it was the Bar V Ranch employees who did the counts.

Defendant testified that he thought he was getting accurate counts at the Bar V Ranch and that he relied on the employees of the Bar V Ranch to provide accurate counts.  He began to think there might be problems with the cattle count at the Bar V Ranch in late November or early December 2004.  The Bar V Ranch had 12 pens, and on that particular occasion, the cattle in nine of them were mixed. Defendant sorted and counted the cattle.  Defendant testified he thought some cattle were missing or possibly out in the pasture with the cows.  The pens were made with electric wire, and the wires were always going down, resulting in the cattle mixing among the pens.  When the cattle mixed, they had to be sorted and put back into pens.  Defendant testified that when he was

loading cattle for shipments, they were often mixed up so he had to sort them before loading them. Plaintiffs' cattle were included in these mixups.  The mixing of cattle was especially problematic, Defendant testified, because Brian Amundson, the owner of the Bar V Ranch, would not let Defendant fix the pens.

Amundson testified that he knew the cattle at the Bar V Ranch were getting mixed up in 2004.  He said that it was indeed a problem, but that it was Defendant's responsibility and not his. Amundson further testified that when FCF loaded cattle, he typically was not there.  He acknowledged that he may have helped load Plaintiffs' cattle on one or two occasions, but that normally he was not present for loading unless his own cattle were being loaded.  Amundson's signature, however, appears to be on most of the brand inspection certificates relating to loads originating from the Bar V Ranch from 2004 that were admitted into evidence. He disputed whether the signatures were actually his on some of the brand inspection certificates and stated that some of the signatures appeared to have been forged.  No one else was authorized to sign his name on brand certificates, but in any event, he said that even if he signed the certificates, it did not mean he was there sorting the cattle.

The fall of 2004 was wetter than usual which resulted in more cattle deaths than usual. Amundson testified that the procedure for cattle that died at his lot involved recording the cattle, removing the ear tag, and documenting it on a death loss report.  Defendant testified he did not personally count the dead cattle, nor did he verify that all the dead cattle were accounted for.

Plaintiff Edward Brown testified that Plaintiffs confronted Defendant after they saw an open brand book that indicated that Defendant had sold three of their cattle without their knowledge or

10

consent.[5]  By custom, the brand book is meant to be confidential, but Plaintiff George Brown saw that some of Plaintiffs' cattle had been shipped, and he asked Defendant about it.  According to Plaintiff George Brown, Defendant hesitated but finally said he was going to tell him about it.  Three cattle were shipped on January 2, 2005, under Plaintiffs' names, and Tyson sent a check for $2,644.47 payable to FCF dated January 17, 2005.  Defendant endorsed the check payable to the account of Plaintiff George Brown.

On January 5, 2005, the cattle were mixed again, and Plaintiffs had a shipment scheduled for the following day.  Defendant testified that the weather on January 5, 2005, was 20-30 degrees below zero, and he spent three hours sorting cattle.  Plaintiff George Brown told Defendant he did not think there were enough big cattle, and Defendant testified that he told Plaintiff George Brown that some had been shipped in December.  Plaintiff George Brown, on the other hand, testified that when he asked Defendant where the big cattle were, Defendant would not answer him.

Plaintiff George Brown testified that the following day, January 6, 2005, Defendant claimed he could not help load cattle for Plaintiffs' scheduled shipments because he had gotten too cold the day before.  Defendant testified he has fibromyalgia, and he became incapacitated from working in the cold on January 5.  Martin was there to help with the shipment.

Plaintiff George Brown testified that he realized on January 6, 2005, that Plaintiffs were missing cattle, and he decided they needed to do a count.  Plaintiffs both testified that they had never counted their cattle previously.  Notwithstanding, Plaintiff George Brown testified that Plaintiffs usually had between 1,050 and 1,075 cattle at any given time during 2003 and 2004.

---

[5] Plaintiff Edward Brown did not say when the confrontation occurred.

Plaintiffs shipped two more loads of cattle on January 7, 2005 – one load had 84 cattle and the other had 86, according to the brand inspector's certificate.  Also on January 7, 2005, Defendant spoke with Plaintiff Edward Brown about the head count at the Bar V Ranch.  After Plaintiff Edward Brown stated his concerns, Defendant called Plaintiff George Brown and arranged for them to meet with Amundson about the situation.  Plaintiff Edward Brown testified that Defendant asked them how much value they were missing, and Plaintiff George Brown said more than $250,000.  Defendant responded that Plaintiffs would have to give him some time to make it up to them.  Plaintiff Edward Brown said Defendant did not blame anyone but did say that the fences "were all busted up."

Defendant met with Amundson the following week and discussed the problems with the cattle count.  Amundson called Fred Frederikson, a brand inspector, and the sheriff.

Defendant testified he contacted Tyson and started going through the computer to make sure all the cattle were accounted for.  He also checked the computer to make sure each shipment was registered.  Defendant testified he did not go back to the Bar V Ranch to count the cattle because Amundson would not allow him back.  Another FCF customer wanted cattle shipped from the Bar V Ranch, so Defendant told Amundson about the shipment and that he would make arrangements with a trucking company.  Defendant returned to the Bar V Ranch for the first time since the situation with the Plaintiffs arose a week earlier to move the customer's cattle, but Defendant was not allowed to count the other cattle.

Amundson testified that he decided to end the Bar V Ranch's arrangement with Defendant in January 2005 because the cattle were not being properly fed.[6]  He sent a letter to Plaintiffs telling

---

[6] Amundson did not specify when in January 2005 he ended the business relationship.

them about his decision, and Plaintiffs opted to keep their cattle with Amundson at the Bar V Ranch.

On January 17, 2005, Amundson helped Plaintiffs count and separate their cattle. He testified that in the final count, there were 13 extra cattle for lots that were not supposed to be at the Bar V Ranch. Plaintiffs and Amundson signed a inventory sheet that shows Plaintiffs had 166 cattle at the Bar V Ranch on January 17, 2005.[7]

On February 11, 2005, Plaintiffs signed a document stating that Lot 392 had 91 head with 1 dead. The cattle inventory done on January 17, 2005, did not include the cattle in Lot 392. Plaintiff George Brown testified that these cattle were mixed with another lot at the time. He also testified, however, that lot 392 was not included in the count because those cows were in Carrington.[8] According to Plaintiffs' counts, therefore, Defendant had control of a total of 258 head of Plaintiffs' cattle that were accounted for on January 17, 2005, plus 92 head that were counted on February 11, 2005, for a total of 258 head.

Defendant testified that a Tyson representative, David Noll, provided him with shipping records that show that Plaintiffs continued to sell their cattle after the cattle count on January 17, 2005. These records show that from February 3 to March 11, 2005, Plaintiffs shipped 476 cattle from the Bar V Ranch to Tyson. Records from Hub City Livestock Auction, Inc., and the North Dakota Stockmen's Association Inspector's Tally show that 319 of Plaintiffs' cattle were shipped to Hub City Livestock Auction between April 13 and May 4, 2005.

---

[7] The inventory sheet is dated January 17, 2004, but the testimony made it clear that the count was done on January 17, 2005, and that the document had been misdated.

[8] The Court infers that this means they were at the Baca Cattle feedlot.

According to Plaintiff Edward Brown, on April 1, 2005, Plaintiffs removed the rest of their cattle from Defendant's lot in Carrington.   Plaintiff George Brown testified that when Plaintiffs removed their cattle on April 1, 2005, Defendant gave them 12 head of cattle.

D.    The Fire

The sale barn in Carrington that Defendant bought to operate Baca Cattle out of burned down in July 2005.  It had been built in 1963 and had a metal exterior with a wood interior.  Defendant testified that because the interior of the building was wood, it was a very hot fire.  The office was on the first floor, and a kitchen was on the second floor above the office.  During the fire, the second floor collapsed onto the first floor.  All of Defendant's records were destroyed in the fire.

According to Defendant, insurance paid $171,000 on the loss, and the money was divided among Defendant, Andrews, and Klein.  In addition to Andrews' $60,000 first mortgage, Klein held a second mortgage in the amount of $250,000.  Defendant testified that he received just enough money to put up a new building, but that he did not personally receive any money.

According to Defendant, Plaintiffs and three other Baca Cattle customers lost cattle in the fire.[9]  Defendant said he notified his insurance company of the loss of between 35 and 100 cattle. The insurance company refused to pay for the losses of Plaintiffs' cattle, however, stating that they do not cover mysterious losses.  Defendant testified that he did not have any records to substantiate the cattle losses because the records were lost in the fire.

---

[9] The Court notes the inconsistency that Plaintiffs had allegedly removed all their cattle on April 1, 2005, yet Defendant claimed Plaintiffs also lost cattle in the fire.

14

E.    Eldred "Fred" Frederikson

Eldred "Fred" Frederikson is a North Dakota brand inspector.  Frederikson testified that under North Dakota law, any cattle leaving a feedlot must be brand inspected.[10]  To get a load inspected, a person shipping a load calls the inspector one or two days ahead of the scheduled load to arrange to have the inspector present.  The brand inspector verifies the count and the ownership of the cattle in the load in a yard book, a 3 x 6 inch tablet on which a brand inspector lists the date, the cattle owner's name, the number of cattle worked, the number of each sex of cattle, and the brand location.  Each book is assigned to a brand inspector, and the certificates are generated in triplicate.  One copy goes to the business office, one to the trucking company and ultimately to the buyer, and the brand inspector keeps the third copy.

When Plaintiffs asked for an investigation into their missing cattle, Frederikson tried to track down the cattle.  He testified he looked into IBP's records,[11] Plaintiff George Brown's feed records, trucking records, and the head count Amundson and Plaintiffs did on January 17, 2005.  Frederikson conceded that he did not have all of Tyson's records and that he was not present for the count on January 17, 2005.  He also conceded that when cattle are shipped, if one is rejected it does not show up on the kill sheet. The end result of Frederikson's investigation was that Plaintiffs were 211 head of cattle short.  Frederikson testified that although he concluded Plaintiffs were missing cattle, he did not know who was to blame.  Frederikson also acknowledged that there were no checks to either FCF's account or Baca Cattle's account for any missing cattle.  He said he suspected the missing cattle were put into someone else's lots.

---

[10] Brand inspectors are law enforcement officers.

[11] Tyson bought IBP.

15

F.    Robert Olson

In March 2005, Plaintiffs hired a private investigator, Robert Olson, to look into whether Plaintiffs were missing cattle from the Bar V Ranch.  Olson went to the Bar V Ranch and interviewed Amundson and three Bar V Ranch employees.  Olson also interviewed Frederikson.

Olson testified that he spoke with Defendant at least four times.  Defendant acknowledged to Olson that cattle were missing and told Olson that he had trouble at the Bar V Ranch because the corrals were wire and the cattle mixed together. Olson testified that Defendant became tearful and remorseful on two or three occasions when they spoke.  Defendant was emotional about how good Plaintiffs had been to him. He admitted that the missing cattle were his fault and expressed a desire to "make it right."  Olson thought Defendant was sorrowful about what had happened.

Olson said Defendant admitted that he had shipped three head of Plaintiffs' cattle, but that he turned the check over to Plaintiffs when they asked him about it.  Defendant explained that he had been loading Amundson's cattle on a truck, that mixups were a common occurrence at the Bar V Ranch, and that he had intended to pay Plaintiffs for the cattle.

Based on the records of Plaintiff George Brown and records from Defendant's office, Olson concluded that 1) Plaintiffs were missing "a lot" of cattle (he clarified that it was "hundreds"), 2) the cattle had been shipped out of various locations, 3) part of the problem was the brand inspector's failure to check cattle and do his job, and 4) Defendant shipped out cattle without Plaintiffs' knowledge or permission for 2-3 years, resulting in an ongoing shortage that became large, and 5) Plaintiffs suffered a loss.   Olson testified that he could not say, however, that money from any sales of allegedly missing cattle went into any of Defendant's accounts.

16

Olson arranged for Plaintiffs to remove their remaining cattle from the Baca Cattle feedlot in Carrington on April 1, 2005, and he also counted the cattle.[12]  According to Olson, those were Plaintiffs' only remaining cattle as they did not have any cattle left at the Bar V Ranch at that time.

G.    Paul Murphy

Paul Murphy, Foster County States Attorney, testified that he became aware of this case when the state appointed Frederikson to investigate Defendant.  According to Murphy, Frederikson had questions about the missing cattle, he had ruled out death loss and theft by an outside party, and his conclusion was that the case involved theft by an inside person with the ability to make the cattle disappear.  Murphy testified it was very hard to determine where the cattle were at any given time, and it was hard to sort out how many cattle were supposed to be in any given lot at any given time.  Murphy testified that although he thought cattle had been stolen, an investigator and the sheriff looked into the matter but could not find either the cattle or any proceeds from any sale of the cattle.

Murphy testified he was suspicious about the fire for a number of reasons.  Two gas cans were found outside the hottest part of the fire.  Defendant said he had been mowing grass, but there was no grass that had been mowed nor was there any grass to mow.  Also, Defendant's story about his whereabouts that day changed after he was first questioned.  The fire was a complete loss, and the file cabinets were open so everything inside them was destroyed.[13]  Lastly, Defendant was behind on his bills.  Murphy thought the totality of the circumstances suggested arson but there was not enough evidence to seek a conviction.

---

[12] He did not testify, however, as to how many cattle there were.

[13] Defendant disputed that the file cabinets had been left open.

H.    Ross Rolshoven

Ross Rolshoven is the owner of Great Plains Investigations and was hired by Plaintiffs' attorney to investigate FCF in preparation for a civil suit against Defendant.  Rolshoven testified that he reviewed accounting records and interviewed various people.   He concluded that 400 of Plaintiffs' cattle were missing.  He testified that he believed Defendant sold the cattle through fraud and billed Plaintiffs for feed that was not actually fed to their cattle because the cattle had been sold.

I.    Michael Klemetsrud

Plaintiffs hired attorney Michael Klemetsrud in May 2006 to find out whether they were missing cattle, and if so, how many, based on their feed records generated by Defendant. Klemetsrud concluded that Plaintiffs should have had 690 cattle in January 2005, but they only had 277,[14] so 413 were missing.  Klemetsrud did not count the cattle; instead he relied solely on the records kept by Plaintiff George Brown's wife, Connie Brown.  Klemetsrud said he verified the records were full and complete by comparing them to checks and invoices, but he did not compare any bank records or verify any of the sales with Tyson.  Klemetsrud conceded that the records for a four-week period during January and February 2005 were missing from his analysis.  He also acknowledged he was missing one bimonthly statement for the time period of 2002-2004.  He had no sales records from February 2005 or beyond.  He acknowledged that if Plaintiffs sold more than 413 cattle after January 2005, then no cattle were missing, but that he would also have to know how many cattle were bought and died during that time period.

---

[14] His report indicates that 166 cattle were "recovered" from the Bar V Ranch on January 17, 2005, and 111 from Carrington on March 10, 2005.  No explanation was given for why he considered the cattle from Carrington "recovered" on March 10 rather than April 1, as testified to by both Plaintiff Edward Brown and Olson.

J.      Subsequent Events

On October 18, 2005, Frederikson signed a criminal complaint alleging Defendant committed theft of property.  Specifically, the complaint alleged Defendant unlawfully transferred six head of cattle, and Frederikson testified the complaint related to Amundson's cattle.  Based on this complaint, Defendant was charged with theft of property on February 14, 2006.  Defendant pled guilty to the charge related to the theft of six of Amundson's cattle.  Amundson testified he has received restitution payments from Defendant.

Murphy testified that another criminal case was brought against Defendant in Foster County but was dismissed by stipulation.  Then, after the case had been brought a second time, the state court judge dismissed it at a preliminary hearing for lack of probable cause on December 20, 2007.  Charges were never refiled against Defendant in relation to any alleged theft of Plaintiffs' cattle.

Defendant and his wife filed a voluntary Chapter 7 petition for bankruptcy relief on August 12, 2008.

## II.  CONCLUSIONS OF LAW

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code.  Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002).  Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge.  Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993).  The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is the preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 286 (1991).

Here, the outcome of the dischargeability issue requires a determination of whether any debt owed to Plaintiffs by Debtor was "for money, property, services, or an extension, renewal, or

19

refinancing of credit, to the extent obtained by . . . a false representation, or actual fraud," 11 U.S.C.

§ 523(a)(2)(A), "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

larceny," 11 U.S.C. § 523(a)(4), or "for willful and malicious injury by the debtor to another entity

or to the property of another entity[,]" 11 U.S.C. § 523(a)(6).  If Plaintiffs prove any of these

exceptions exist, the debt is nondischargeable.

A.      11 U.S.C. § 523(a)(2)

        In their complaint, Plaintiffs argue Defendant's alleged debt to them for their missing cattle

is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) because Defendant made false representations

that he would properly care for, fatten, and sell Plaintiffs' cattle and account for and pay the

proceeds to Plaintiffs. Plaintiffs further argue that Defendant committed actual fraud by breaching

his representations to Plaintiffs and by failing to account for Plaintiffs' cattle and proceeds.

        To obtain a determination that a debt should be excepted from discharge for money obtained

by a debtor's false pretenses, false representation or actual fraud, other than a statement respecting

the debtor's or insider's financial condition, a creditor must prove:

> (1)    the debtor made a false representation;
> (2)    the debtor knew at the time that the representation was false;
> (3)    the debtor made the representation deliberately and intentionally with the
>        intention and purpose of deceiving a creditor;
> (4)    the creditor justifiably relied on the representation; and
> (5)    the creditor sustained alleged losses and damages as a proximate result.

R & R Ready Mix, Inc. v. Freier (In re Freier), 402 B.R.891, 897 (B.A.P. 8th Cir. 2009).  In assessing

a debtor's knowledge of the falsity of the representation, the court must consider the knowledge and

experience of the debtor.  Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785,

791 (B.A.P. 8th Cir. 1999) (citing In re Duggan, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)).  A false

representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth and satisfies the knowledge requirement.  Id.

It is undisputed that Defendant represented to Plaintiffs that he would care for and sell Plaintiffs' cattle and pay the sale proceeds, minus any feed debt, to Plaintiffs.  What is not clear, however, is whether this representation was false.  Plaintiffs do not allege that Defendant failed to care for their cattle; rather, they allege he sold their cattle without giving Plaintiffs the proceeds.

Although Plaintiffs confronted Defendant about selling three of their cattle without their consent after Plaintiff George Brown saw the open brand book, Defendant turned over the check for those cattle to Plaintiffs.  This occurrence therefore does not show that Defendant sold Plaintiffs cattle without paying Plaintiffs for them.

Next, Plaintiffs had several witnesses testify that Plaintiffs were missing cattle, but the reliability of those conclusions is questionable for various reasons, including that none of the records used by any of the witnesses who investigated the matter were complete.

Frederikson concluded that Plaintiffs were 211 cattle short, but he also conceded that he did not have complete records from which to draw his conclusions.  The evidence admitted during Frederikson's testimony, including summaries he prepared for given time periods, is disorganized and at times incomprehensible.  It contains mathematical errors.  Most significantly, Frederikson testified that he did not know who was to blame for the missing cattle.  In other words, according to Frederikson, someone other than Defendant may have been responsible for the missing cattle. He testified that no checks were deposited into either FCF's account or Baca Cattle's account for any missing cattle.

Murphy testified that he thought Defendant stole Plaintiffs' cattle, but that no one who investigated the matter could find either the cattle or any proceeds from any sale.

Olson concluded that Plaintiffs were missing "a lot"[15] of cattle based on his review of records from Plaintiff George Brown and records from Defendant's office.   No documentary evidence was submitted to show how he arrived at this conclusion.  He also testified  that part of the problem in this case was the brand inspector's failure to do his job and properly check the cattle that were being shipped.

Rolshoven concluded 400 cattle were missing, but the only documentary evidence submitted during his testimony was his reports to Plaintiffs' attorney in preparation of their state court civil suit related to this case.   These reports are rife with hearsay, they are cumulative to the other evidence submitted in this case, and the Court assigns them very little credibility.

Klemetsrud concluded that 413 cattle were missing, but he conceded that he was missing a bimonthly statement for the time period of 2002-2004 and the records for a four-week period during January and February 2005.  The numbers used by Klemetsrud as cattle "recovered" do not include the 92 head from lot 392. He also did not consider any sales records after January 2005, and conceded that if Plaintiffs sold more than 413 cattle after February 2005, depending on how many cattle they purchased and how many died, Plaintiffs may not have been missing any cattle.  He did not compare the numbers he was given from Plaintiffs to any Baca Cattle records, actual records of any of Plaintiffs' cattle sales, or any numbers for sales by Plaintiffs after January 2005.  In short, Klemetsrud's conclusion is unsubstantiated.

---

[15] He also quantified the number of cattle missing, slightly less vaguely, as "hundreds."

The Tyson shipping records show that Plaintiffs continued to sell their cattle after the cattle count on January 17, 2005. These records show that from February 3 to March 11, 2005, Plaintiffs shipped 476 cattle from the Bar V Ranch to Tyson. Records from Hub City Livestock Auction, Inc. and the North Dakota Stockmen's Association Inspector's Tally show that 319 of Plaintiffs' cattle were shipped to Hub City Livestock Auction between April 13 and May 4, 2005. These sales could have included the allegedly "missing" cattle. Plaintiffs failed to demonstrate how this was outside the realm of possibilities.

Another problem with Plaintiffs' case is that there is no evidence of any complete count of Plaintiffs' cattle at any time prior to January 5, 2005. Plaintiffs both acknowledged that they never counted their cattle prior to January 5, 2005, and no independent cattle counts were ever performed.

Significantly, no evidence was offered to show that any money Defendant received for Plaintiffs' cattle was not either given to Plaintiffs or credited to Plaintiffs on a feed bill invoice. For all of these reasons, it is impossible to conclude that a preponderance of the evidence shows that 1) Plaintiffs are missing cattle; 2) Defendant was the person responsible for any missing cattle, and 3) Defendant sold the cattle without giving the sale proceeds to Defendants. The Court therefore cannot conclude that Defendant's representation that he would care for the cattle and pay Plaintiffs the proceeds of the sale of their cattle was false at the time Defendant made it.

Even if Defendant's representations were false, the Court is also not convinced that Defendant knew at the time he made it that it was false or that Defendant made the representation deliberately and intentionally with the intention and purpose of deceiving Plaintiffs.

Lastly, Plaintiffs have not proven that they sustained a loss as a proximate cause of the alleged misrepresentation. First, as discussed above, the Court is not convinced Plaintiffs have

demonstrated a loss by a preponderance of the evidence. Moreover, any loss could have resulted from several factors including, but not limited to, the brand inspector's failure to adequately inspect the cattle, poor feedlot management generally, death losses not appropriately accounted at the feedlots, death losses in the fire, an honest mistake due to the mixing of the cattle at the Bar V Ranch, or possible embezzlement by another employee of FCF, the Bar V Ranch, or Baca Cattle.

Plaintiffs also claim in their post-trial brief that Defendant's representations about the cattle shortages and his intent to rectify them were false at the time he made them. The evidence, however, does not support a finding that these representations were false or that Defendant knew they were false at the time he made them. Next, Olson testified that Defendant became tearful and remorseful on two or three occasions when they spoke about the situation. Defendant was emotional about how good Plaintiffs had been to him, admitted the missing cattle were his fault, and expressed a desire to "make it right." Olson testified he thought Defendant was sorrowful about what had happened. This reaction is inconsistent with a finding that Defendant intended to deceive Plaintiffs when he said he would rectify the shortage. Finally, Plaintiffs did not prove that they sustained losses as a result of Defendant's representation that he would rectify the losses. Rather, after they confronted Defendant about the cattle count, Defendant was denied further access to the Bar V Ranch by Amundson.

For the reasons already discussed, Plaintiffs also failed to prove actual fraud, and their claim under section 523(a)(2)(A) fails.

B.      Section 523(a)(4)

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4).

1.      Fiduciary Capacity

To prevent the discharge of Defendant's alleged debt under section 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, Plaintiffs must establish the following two elements: (1) a fiduciary relationship existed between the Plaintiffs and Defendant; and (2) Defendant committed fraud or defalcation in the course of that fiduciary relationship. See Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001).

Whether a relationship is a fiduciary relationship within the meaning of section 523(a)(4) is a question of federal law. Id. The fiduciary relationship must arise from an express or technical trust, and therefore, the fiduciary relationship required under section 523(a)(4) is more narrowly defined than that under the general common law. Id. As a result, the broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable. Id. A merely contractual relationship is less than what is required to establish the existence of a fiduciary relationship. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curiam).

In the instant case, the oral contract between Plaintiffs and Defendant did not impose an express or technical trust. Defendant was not acting in a fiduciary capacity toward Plaintiffs; rather, the relationship between Plaintiffs and Defendant was merely contractual.

2.      Embezzlement or Larceny

Embezzlement is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.  Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988).   As discussed above, Plaintiffs failed to prove Defendant committed fraud ,and therefore they did not prove a fraudulent appropriation.

Larceny similarly involved a misappropriation by a debtor, but larceny applies when a debtor comes into possession by unlawful means.  See Werner v. Hofmann, 5 F.3d at 1172.  Defendant did not come into possession of Plaintiffs' cattle by unlawful means.

Plaintiffs' claim under section 523(a)(4) fails.

C.      Section 523(a)(6)

Plaintiffs lastly argue that Defendant's alleged debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) because the Debtor willfully and maliciously injured them.

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).   In this context, the term willful means deliberate or intentional.  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); Hobson Mould Works, Inc. v. Madsen (In re Madsen), 195 F.3d 988, 989 (8th Cir. 1999).  The injury, and not merely the act leading to the injury, must be deliberate or intentional.  Geiger, 523 U.S. at 61- 62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm.  Madsen, 195 F.3d at 989.  Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic  interests and expectancies.  Barclays Amer./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 881 (8th Cir.1985).  The debtor's knowledge that he

26

or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). Conduct which is certain or almost certain to cause financial harm to the creditor is required. Id.

Generally, debts for breach of contract are not excepted from discharge under section 523(a)(6). Cutler v. Lazarra (In re Lazarra), 287 B.R. 714, 722 (Bankr. N.D. Ill. 2002). This is true even in the case of an intentional breach of contract. Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001), cert. denied, Jercich v. Petralia, 533 U.S. 930 (2001). Because the alleged debt in this case arises from breach of the parties' oral contract, it does not fall within the exception under section 523(a)(6).

Moreover, even if the debt did not arise out of a breach of the parties' contract, the circumstances of this case demonstrate that Defendant was a poor manager who did not properly run his feedlots. His poor management may even have risen to the level of reckless disregard of Plaintiffs' economic interests, but the evidence does not show that he intended to injure Plaintiffs. As already discussed, when he learned Plaintiffs were missing cattle, he was remorseful and wanted to make things right. The fire that may have killed some of Plaintiffs' cattle and destroyed Defendant's records was suspicious, but no arson charges were brought against Defendant, and the insurance company paid on the loss of the building presumably after its own investigation. Suspicion, even in conjunction with the other circumstances in this case, does not rise to the level of a preponderance of the evidence, and Plaintiffs' claim under section 523(a)(6) fails.

Because the Court concludes that even if Defendant had personal responsibility for the debt, the debt is dischargeable, the Court need not address the legal and factual issues concerned with Defendant's limited liability affirmative defense.

27

The Court has considered all other arguments and deems them to be without merit.

Based on the foregoing, Plaintiffs Edward L. Brown and George A Brown did not prove a basis for nondischargeability under 11 U.S.C. § 523(a)(2), (4) or (6), and the Complaint against Debtor/Defendant Audie L. Baca is DISMISSED.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this July 2, 2009.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**

28